IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

STEVEN J. SCHULTE,

        Plaintiff,

vs.

                             No. CIV 98-866 MV/LFG

KENNETH S. APFEL, Commissioner,
Social Security Administration,

        Defendant.

FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

OCT 18 2000

CLERK

## MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION[1]

Plaintiff Steven J. Schulte ("Schulte") invokes this Court's jurisdiction under 42 U.S.C.

§ 405(g) seeking judicial review of a final decision of the Commissioner of Social Security

("Commissioner"). The Commissioner determined that Schulte was not eligible for disability

insurance benefits ("DIB") under Title II of the Social Security Act, nor for supplemental security

income ("SSI") under Title XVI of the Act. Schulte moves this Court for an order reversing the

Commissioner's final decision and remanding for a rehearing.

### Factual Summary and Procedural History

Schulte was born on August 28, 1957 and was 38 years old at the time of the

administrative hearing in this case. (Transcript of Proceedings, at 33; hereafter referred to as "Tr.

---

[1]Within ten (10) days after a party is served with a copy of the legal analysis and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and recommendations. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the analysis and recommendations. If no objections are filed, no appellate review will be allowed.

33"). He is a high school graduate and was planning to begin college classes at the time of the administrative hearing. (Tr. 252). Schulte's previous work experience is as a carpenter in the construction industry, farmer/laborer, motorcycle mechanic, laborer in the sawmill industry, and derrick hand in the oilfield. (Tr. 78).

He alleges he has been unable to work since April 30, 1994, when he was injured in a motorcycle accident. Schulte's complaints arising from this accident, as well as from a separate automobile accident occurring in December 1994, include problems with his back, neck, shoulders, elbows, and wrists, headaches, ringing in his ears, and mental impairments including depression, post-traumatic stress disorder ("PTSD"), and a driving phobia.

Schulte's application was denied at the initial and reconsideration stages, and he sought timely review from an Administrative Law Judge ("ALJ"). An administrative hearing was held on January 11, 1996. In a decision dated August 5, 1996, the ALJ found that Schulte was not disabled within the meaning of the Social Security Act and held that Schulte was not entitled to a DIB or SSI benefits.[2] The ALJ's decision was upheld by the Appeals Council on June 17, 1998. This appeal followed.

The Commissioner correctly points out that, in order to recover DIB benefits under Title II, Schulte must establish that his disability commenced prior to his date last insured, Potter v. Secretary of Health & Human Services, 905 F.2d 1346, 1348-49 (10th Cir. 1990), which was December 31, 1994, and that it had lasted or was expected to last at least twelve months. However, the ALJ may consider evidence of Schulte's condition outside of this time period for

---

[2]The decision of the ALJ is attached to this Analysis and Recommended Disposition.

2

the purpose of providing a full picture of the claimant's medical treatment history. Dugan v. Sullivan, No. 89-1121-C, 1991 WL 105230, at * 4 (D. Kan. May 31, 1991). For example, when the claimant's later medical records contain references to medical findings dating from the relevant period, or "disclose the severity and continuity of impairments existing before the earning requirement date or . . . identify additional impairments which could reasonably be presumed to have been present and to have imposed limitations as of the earning requirement date." Baca v. Dept. of Health & Human Servs., 5 F.3d 476, 479 (10th Cir. 1993).

The 12-month requirement applies to claims for SSI benefits under Title XVI, as well as to DIB benefits. SSR 82-52, 1982 WL 31376, at *1. Entitlement to SSI benefits begins as of the month of application or the date of onset, whichever is later. SSR 82-52, *supra*, at *2. In addition, in making the entitlement determination in SSI cases, the Commissioner may consider evidence relating to the period up to the date of the ALJ's decision. 20 C.F.R. §§ 416.1470(b); 416.1476(b)(1) (2000). Thus, to be eligible for SSI benefits, Schulte must establish that he was disabled for a one-year period between the date of onset and the date of the ALJ's decision (August 5, 1996). Evidence of Schulte's condition between April 30, 1994 and August 5, 1996 is relevant in this case and may be considered in determining whether he is disabled within the meaning of the Act.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[3] The burden rests upon the claimant throughout the first four steps of this process to prove disability,

[3]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (2000); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

3

and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five.  If at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[4]

Briefly, the steps are:  at step one, claimant must prove he is not currently engaged in substantial gainful activity;[5] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits [his] physical or mental ability to do basic work activities . . . .;"[6] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (2000);[7] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[8]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[9] age, education and past work experience, he is capable of performing other work.[10]  If the Commissioner proves other work exists which the

---

[4]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (2000); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[5]20 C.F.R. §§ 404.1520(b), 416.920(b) (2000).

[6]20 C.F.R. §§ 404.1520(c), 416.920(c) (2000).

[7]20 C.F.R. §§ 404.1520(d), 416.920(d) (2000).  If a claimant's impairment meets certain criteria, that means his impairments are "severe enough to prevent a person from doing any gainful activity."  20 C.F.R. §§ 404.1525(a), 416.925(a) (2000).

[8]20 C.F.R. §§ 404.1520(e), 416.920(e) (2000).

[9]The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are:  sedentary, light, medium, heavy and very heavy.  20 C.F.R. §§ 404.1567, 416.967 (2000).

[10]20 C.F.R. §§ 404.1520(f), 416.920(f) (2000).

claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[11]  In the case at bar, the ALJ made his dispositive determination of non-disability at step five of the sequential evaluation.

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Glenn v. Shalala, 21 F.3d 983 (10th Cir. 1994).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992.  In Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.  [Citations omitted].

If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.  The Court cannot reweigh the evidence or substitute its judgment for that of the Commissioner.  Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

Schulte contends that the final administrative decision is not supported by substantial evidence and that the Commissioner did not apply the correct legal standards.  He claims that the ALJ erred in finding that Schulte had not been disabled for a period of twelve months, in his

---

[11]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

finding that Schulte had the RFC for light work with a sit/stand option, in his assessment of Schulte's credibility, in posing an inaccurate hypothetical question to the vocational expert, and in accepting the expert's testimony which assumed skills Schulte had not used in any past employment and which was not responsive to the ALJ's hypotheticals. In addition, Schulte contends that he was biased by incompetent representation at the administrative hearing.

Discussion

### A. The ALJ's "Step Five" Determination

The ALJ, as noted above, made his determination at step five of the analysis. He found that Schulte has not engaged in substantial gainful activity since his onset date, and that he has a combination of severe impairments including depressive disorder, headaches, and injuries to the wrists, neck and back, but that these impairments do not meet or equal the Listing of Impairments. (Tr. 14, 19-20). The ALJ further found that Schulte has the RFC for light work with a sit/stand option and with the further restriction that, because of his depression, he should not perform work which requires contact with the public. He cannot return to any relevant past work. (Tr. 22).

With these findings, the burden shifted to the Commissioner at step five to show that Schulte, based on his RFC and given his age, education, and past work experience, is able to engage in other work that exists in the national economy. In this case, the ALJ found that such work exists for Schulte, and in doing so utilized the testimony of Judith Beard, a vocational expert ("VE"). The VE testified at the administrative hearing that, given Schulte's background and RFC, jobs available to him in the national economy include dispatcher, surveillance monitor, telephone answering service operator, and small product assembly work. (Tr. 284-88). The ALJ adopted the VE's opinion, finding that Schulte was capable of making a satisfactory adjustment to three

6

of these jobs: non-emergency dispatcher, surveillance monitor, and telephone answering service operator. The ALJ also found that such jobs exist in significant numbers in the national economy. He therefore found that Schulte was not disabled, and he denied benefits.

The step five analysis has been described as a two-stage process. The ALJ must first assess the claimant's RFC and consider it along with his age, education and work experience; he must then determine whether jobs exist in the national economy that a person with the claimant's qualifications could perform. Heckler v. Campbell, 461 U.S. 458, 460-61, 103 S. Ct. 1952, 1954 (1983). Schulte argues that the ALJ erred in making both of these determinations.

     1. RFC Assessment.

First, Schulte contends that the ALJ's RFC assessment was not supported by substantial evidence. In making the RFC assessment, the ALJ is to consider the claimant's impairments, and any related symptoms such as pain which may cause physical and mental limitations, and then assess "what [the claimant] can still do" despite these limitations. 20 C.F.R. §§ 404.1545(a); 416.945(a) (2000).

> RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule. RFC does not represent the least an individual can do despite his or her limitations or restrictions, but the most.

SSR 96-8p, 1996 WL 374184, at *2. "RFC is the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." SSR 83-10, 1983 WL 31251, at *7.

The ALJ found that Schulte has the RFC to perform light work, with two limitations: he

requires the option to alternate sitting and standing throughout the day and, because of his depression, he should not perform work which requires contact with the public. (Tr. 22). Because the ALJ found that Schulte could not perform the full range of light work, he appropriately called in a VE, instead of relying on the grids. Trimiar, at 1332-33.

Light work involves lifting up to 20 pounds occasionally and up to 10 pounds frequently throughout a work day. A job which requires lifting little or no weight is also in the "light" category if it demands a good deal of walking or standing, or involves sitting most of the time with some pushing and pulling of arm or leg controls, requiring greater exertion than in sedentary work. 20 C.F.R. §§ 404.1567(b), 416.967(b) (2000). "Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work." SSR 83-10, supra, at *6.

The Court finds substantial evidence in the record to support the ALJ's determination that Schulte retained the RFC for light work, limited by a sit/stand option and a depressive disorder, during the relevant period. Schulte contends that his combination of head, neck, back, shoulder, and wrist injuries and accompanying pain, along with his psychological complaints including depressive disorder, PTSD and driving phobia, render him incapable of working. The Commissioner argues that the ALJ was correct in his finding that "[t]he claimant has symptom-producing medical problems but exaggerates the symptoms and functional limitations produced thereby. Hence, the claimant's testimony does not credibly establish symptoms or functional limitations to the extent alleged." (Tr. 21). The ALJ went on to hold that, although Schulte has

8

established that he experiences some pain and weakness to the extent that his subjective complaints would preclude him from doing heavy or greater exertional work, in the main, "I do not find the claimant's allegations of disabling weakness and pain credible." (Tr. 21).

A claimant alleging disabling pain must present evidence of medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that could "reasonably be expected to produce the pain or other symptoms alleged." 42 U.S.C. §423(d)(5)(A); 20 C.F.R. §§ 404.1529(a), 416.929(a) (2000). There is no question that Schulte suffered from physical impairments during at least part of the relevant period, which are documented by "medically acceptable clinical or laboratory diagnostic techniques." The issue is whether the conditions could reasonably be expected to produce the degree of pain alleged, during the period in question. The ALJ found that they could not. The Court will generally give deference to the ALJ's conclusions regarding a claimant's credibility and "may not disturb the ALJ's finding when the appellant's complaints of pain are not supported by the medical evidence in the record." Campbell v. Bowen, 822 F.2d 1518, 1522 (10th Cir. 1987). However, "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988).

Once the claimant demonstrates an impairment, and at least a loose nexus between the impairment and the pain alleged, the ALJ must consider all the evidence presented that could reasonably produce the pain alleged. Luna v. Bowen, 834 F.2d 161, 165 (10th Cir. 1987). Factors to be considered include the claimant's persistent attempts to find relief for the pain and his willingness to try any treatment prescribed, whether he had regular contact with a doctor, the

9

possibility that psychological disorders combine with his physical problems, the nature of his daily activities, the dosage and effectiveness of any medications, and subjective measures of credibility that are peculiarly within the judgment of the ALJ.  Id.; Hargis, at 1489.

Schulte was treated at the Veteran's Hospital in Albuquerque for injuries sustained in the motorcycle accident of April 30, 1994, in which he was not wearing a helmet.  He presented at the emergency room with multiple abrasions to his face and skull and complaining of "pain all over," but particularly located in the neck, head, and left wrist.  He received stitches and wound cleansing, and radiology tests were ordered.  He was released with instructions to rest at home, return for stitch removal in a few days, apply ice to his neck and other painful areas as needed, and go to urgent care if further problems developed.  (Tr. 98, 100).

On April 30 and May 1, 1994, x-rays were taken of Schulte's cervical spine, mandible, and his left forearm, wrist, and hand.  CT scans were done on his head and cervical spine.  These test showed no fractures and no disruption of overall bony alignment, including joint spaces.  (Tr. 101-108).  Aside from some soft tissue swelling noted in the forearm and wrist (Tr. 104-05), the only abnormality in these radiologic exams was seen in the spinal x-ray, which showed a slight offset of the right lateral mass, and possible disruption of the posterior arch, of C1.  (Tr. 101).  The radiologist felt that these abnormalities may be due to bending by the patient during imaging, or a congenital anomaly, and recommended a CT scan which was done the next day.  It, too, was inconclusive, showing an "irregularity" in the right occipital condyle and right lateral mass of C1 which might indicate a fracture.  Re-scanning was recommended.  (Tr. 108).  Dr. Valerie Ross called Schulte on May 2 and left a message for him, asking him to come in for a repeat CT scan.  (Tr. 97).  There is no indication in the record that Schulte returned for re-imaging.

On May 10, 1994, Schulte consulted Dr. Don W. Hedges, D.O., complaining of headaches as well as pain in the back, both elbows, and left wrist. (Tr. 235). Dr. Hedges noted that examination of Schulte's cervical area showed significant tenderness throughout the cervical musculature, although no evidence of cervical radiculitis[12] or radiculopathy[13] were noted. (Tr. 236-37). Examination of the shoulders and elbows revealed significant tenderness; however, of motion in these joints was normal. Range of motion in the right wrist was normal; however, the left wrist exhibited some abnormalities. The thoracic region of the spine was somewhat tender, but the range of motion was normal. There was no evidence of lumbar disc problems nor of lower extremity radiculitis or radiculopathy. Knees and ankles were normal. Schulte could walk with "mild duplication of pain" in the low back region. There was "some aggravation of . . . discomfort" of the sacroiliac upon movement of the right hip, but the range of motion of this joint was normal. Schulte's jaw showed a "moderate degree of tenderness." (Tr. 237).

X-rays taken on May 10 showed findings consistent with cervical muscle spasm, and a possible abnormality of the L5 vertebra; otherwise, no fractures or other bony pathology appeared. (Tr. 237-38). Dr. Hedges' overall diagnosis was multiple soft tissue injury and strain in the spine, wrists, and elbow, and he recommended that Schulte return three times a week for physical therapy. (Tr. 238). Schulte continued to see Dr. Hedges regularly for approximately the next year and a half.

Although Schulte continued to complain of pain in the head, neck, jaw, wrists, shoulder,

---

[12]Radiculitis is defined as "inflammation of the root of a spinal nerve." Dorland's Illustrated Medical Dictionary 1108 (26th ed. 1981) (hereafter cited as "Dorland's").

[13]Radiculopathy is defined as "disease of the nerve roots." Dorland's, at 1109.

and tailbone in the two months following the motorcycle accident, the ALJ's characterization is accurate that Dr. Hedges reported a steady improvement in Schulte's condition through May and June of 1994. (Tr. 127-130). Dr. Hedges prescribed analgesics Lortab and Motrin, which helped relieved the symptoms of pain, although Schulte reported to Dr. Hedges that the Lortab made him drowsy and he had begun to take it only for severe pain. (Tr. 129, 130, 132).

In June 1994, Schulte was still complaining of significant wrist pain, and Dr. Hedges referred him to the Hand Clinic and for evaluation by Dr. George R. Swajian, D.O. (Tr. 129). The Hand Clinic evaluation, which appears to have been signed by a non-physician, indicates that Schulte's range of motion in the wrists, forearms, elbows, and shoulders was within normal limits, although the wrist range of motion was slightly less on the right side. His strength fell well below normal limits, but the examiner stated that "he presented highly inconsistent results on this examination, reporting pain throughout all types of grip testing . . . Therefore, I do not feel that the strength testing is an accurate portrayal of what his functioning truly is at this time." The examiner concluded that, other than some slight tenderness and some limited range of motion, there were no obvious problems. (Tr. 206-08).

Dr. Swajian examined Schulte on June 29, 1994. Although he noted a slight restricted range of motion in the left wrist, he found that the ranges were well within normal limits. He diagnosed a strain/sprain of both wrists, and a strain/sprain of the cervical, dorsal, and lumbar spine, with no restricted motion remaining. He felt that Schulte sustained a cerebral concussion in the motorcycle accident and recommended evaluation by a neurologist. He also recommended a program of strengthening for the wrist, neck, back, and legs. (Tr. 175-79).

In August 1994, Schulte began seeing a physical therapist. At his initial evaluation,

Schulte stated that he had constant neck pain, headaches, morning pain and stiffness, shoulder discomfort, and low back pain. (Tr. 165). X-rays and CT scan tests were negative at that time. The overall assessment of Schulte's condition by the physical therapist was that he had sustained soft tissue injuries to the cervical-lumbar spine and left shoulder, but no neurological impairments; rehabilitation potential was noted as fair to good. (Tr. 168). An exercise program was prescribed, which Schulte followed from August to November 1994, during which period he made steady improvement. (Tr. 141-164). On August 31, Dr. Hedges noted that the physical therapy was helping considerably. (Tr. 124). In September, the physical therapist stated that although Schulte was not reporting any subjective improvement, his objective functional improvement had markedly increased. (Tr. 154). Although Schulte still had lumbar/cervical pain and a ringing in his ears, by November 1994, he showed sufficient objective improvement that the physical therapist reported to Dr. Hedges that Schulte had reached maximal medical improvement, and the therapist discharged him from the active physical therapy program. (Tr. 143).

On September 1, 1994, Schulte was referred to Michael Freedman, M.D., a specialist in internal medicine, for evaluation of his headaches. (Tr. 134-36, 198). Schulte stated that he had headaches most days of the week, lasting from one to four hours at a time. Dr. Freedman felt that the headaches were a post-traumatic symptom, combined with muscle tension and contraction. He was concerned about a tingling discomfort spreading from the neck into the upper extremities, and he recommended a MRI of the cervical spine and CT scan of the head. (Tr. 136). These tests showed no neurological abnormalities. (Tr. 134). Dr. Freedman noted Schulte's complaints of feeling anxious and depressed, and he encouraged Schulte to contact a psychiatrist. (Id.).

Dr. Hedges had noted as early as May 1994 that Schulte appeared to be somewhat

13

depressed and anxious, but he felt this would "resolve as his somatic/skeletal problems repair." (Tr. 132). In May, Dr. Hedges prescribed the antidepressant Pamelor, and in September he prescribed another antidepressant, Zoloft, although by October, Schulte stopped taking the Zoloft because he felt it made him anxious. (Tr. 122, 123, 130, 270).

Schulte continued to see Dr. Hedges throughout the summer and fall of 1994, and his condition improved markedly, although he still had complaints of pain in the wrists, and cervical and lumbar spine. On July 12, 1994, the range of motion in Schulte's wrists was normal. (Tr. 125). On July 21, Schulte exhibited a "very mild degree of tenderness" in the mid-back dorsal region, with range of motion within the normal range, although in August, he experienced "significant muscle spasms." (Tr. 124-25). Dr. Hedges noted that the MRI ordered by Dr. Freedman was "entirely within normal range." (Tr. 123). On July 28, 1994, Dr. Hedges noted that Schulte was still complaining of wrist pain and pain in the cervicodorsal region, although his range of motion in the back was much improved. (Tr. 126). He complained of headaches and ringing in the ears throughout the fall. (Tr. 121-124).

On September 13, 1994, Dr. Hedges referred Schulte to the Hand Clinic for a re-evaluation. Range of motion in the hand, wrist, forearm, elbow, and shoulder were found to be normal. (Tr. 202). His strength was within normal limits. (Tr. 205). He did not perform well on the endurance portion of the test, complaining of shoulder pain; however, the examiner felt this was relatively subjective and Schulte did not appear to be putting forth his best effort in performing repetitive exercises. (Id.).

On November 21, 1994, Dr. Hedges noted that Schulte's condition was approximately seven months old and "is certainly becoming chronic," and he noted the physical therapist's

14

opinion that Schulte had reached maximal medical improvement. (Tr. 121).  In November 1994,

Schulte was seen by Lynn Estrada, a social worker at All Walks of Life Counseling Center.  He

told her that he had been experiencing depression, sleep disturbance, nightmares, fear of driving,

and bursts of anger.  He was diagnosed as having post-traumatic stress disorder, and a twelve-

week course of therapy was recommended.  (Tr. 95-96).  Schulte apparently began therapy with

Ms. Estrada and found it somewhat helpful, but he did not complete the full course of therapy,

as he found it too stressful to drive for treatments due to his driving phobia.  (Tr. 181).

On December 7, 1994, Schulte was involved in a second motor vehicle accident. (Tr. 117,

171).  As a result of the accident, he experienced pain in the back, shoulders, and wrists.  He was

seen at an emergency room, where he was x-rayed and released. (Tr. 171).  Dr. Hedges treated

him with Tylenol, ice packs and heat on December 12, and on December 16, he noted that Schulte

was making some progress, "although the second accident certainly has caused some difficulty"

in his cervical-dorsal area, and in the neck and shoulder region. (Tr. 120).

Dr. Hedges sent Schulte to Dr. Swajian again on February 9, 1995 for a second

evaluation, to determine the extent of aggravation caused by the second accident.  (Tr. 117).

Schulte told Dr. Swajian that he had been experiencing constant pain in his neck, back and wrists.

(Tr. 172).  Examination revealed limitations in Schulte's range of motion in the cervical and

thoracic areas and muscle spasms in the back.  X-rays of the spine were essentially normal,

although they showed some evidence of muscle spasm.  He had a strain/sprain of the neck and

upper back and shoulders, with a minor impingement syndrome in the shoulders. (Tr. 173).  Dr.

Swajian recommended manipulative treatment for the back and neck, followed by physical

therapy.  He seems to state that prognosis is good for regaining normal range of motion in the

cervical spine. (Tr. 173-74). On February 16, Dr. Hedges noted his concurrence with Dr. Swajian's recommendations, and stated he felt Schulte's condition is becoming chronic and his prospects for a complete recovery becoming less favorable. (Tr. 227).

Schulte was seen by Dr. Gerald S. Fredman, M.D., a psychiatrist, on February 19, 1995. He told Dr. Fredman that he had been having problems with depression and anxiety since May 1994. He experienced nightmares, felt worthless and tired all the time, and had been more reclusive since the motorcycle accident. He maintained a full schedule of daily activities, although he did not drive unless absolutely necessary. (Tr. 180-83). Dr. Fredman noted that Schulte had a depressive disorder, driving phobia, and post traumatic syndrome, and reported that he exhibited moderate impairment. He felt that Schulte would benefit from a combination of supportive psychotherapy and antidepressant medication. Dr. Fredman concluded that Schulte's potential for sustained work activity was "fair, at best" from a psychiatric viewpoint, and that his depression might cause him problems in handling the stress of a job and relating to coworkers.

Schulte continued to see Dr. Hedges throughout most of 1995. In April, Dr. Hedges referred him to another course of physical therapy, which he attended for approximately a month, with positive results. (Tr. 185-97). He was discharged from physical therapy on May 25 with a recommendation that he return to a gym for more vigorous active exercises. Schulte stated he felt confident he could perform the gym exercises without difficulty. (Tr. 185-86). Schulte did begin a gym program, and by August 1995 was able to walk a treadmill for about 20-25 minutes and lift up to 40-pound weights, although he did report discomfort after a gym routine in August. (Tr. 217). Throughout 1995, Schulte continued to complain of pain in the wrists, cervical area, hip, shoulder, neck and head and was treated with analgesics and physical therapy. (Tr. 209-221).

16

On two occasions during this period, Dr. Hedges noted that although Schulte complained of pain in the wrists and cervical area, his range of motion in those areas was normal. (Tr. 217, 221).

On November 1, 1995, Dr. Hedges reported that Schulte's spine in particular and overall medical condition in general were within normal limits. It was his opinion that Schulte's condition at that time "is certainly chronic and further significant improvement is probably not likely." (Tr. 209). He stated that he did not feel he could provide any further therapy for Schulte, who would best benefit from an aggressive spa program, with the use of analgesics as needed. He concluded that although Schulte would probably continue to have cervical pain and might need occasional physical therapy, his condition and prognosis were both good, that could return to his usual work and normal activities of daily living. (Tr. 210).

Schulte hasn't seen Dr. Hedges since Nov. 1995. (Tr. 256-57). In January 1996, Schulte went to see Dr. Swajian on his own, because he felt "there were some problems that weren't addressed in his [Dr. Hedges'] last report that needed to be taken care of." He basically wanted a "second opinion." (Tr. 278-79). Dr. Swajian felt that Schulte had a permanent impairment to the cervical spine and was probably at maximum medical improvement in that regard. Because of Schulte's continuing headaches, he recommended a neurologic evaluation for possibly post-traumatic cephalgia, and another evaluation of the hands and wrists. (Tr. 243-44). He did not feel that Schulte would be capable of working in the construction industry and "I would probably limit him to a light-to-sedentary occupation," although he noted he was not making a detailed evaluation of the Schulte's capabilities. (Tr. 244).

Also in January and continuing to February 1996, Schulte was seen by Charlotte Glass, M.A., at Valencia Counseling Services. She noted that Schulte's condition was within normal

limits. He exhibited anxiety and a depressed mood, but was oriented, attentive, cooperative, and friendly. No psychosis or thoughts of suicide were present. (Tr. 318). She noted some concern with affect and mood swings, lack of tolerance for conflict, a high anxiety level, isolation and deficiency in relating to others, irritability, sadness despondency, with no interest in working on relationships. (Tr. 314). Schulte was diagnosed with depression and affective disorder due to head injury. (Tr. 320).

This record supports the ALJ's finding that Schulte had the RFC for light work, with a sit/stand option and limited contact with the public. As noted above, in making an RFC assessment, the ALJ is expected to consider the claimant's impairments, and any related symptoms such as pain which may cause physical and mental limitations and then assess what the claimant can still do despite these limitations. The ALJ found Schulte's allegations of pain less than credible. An examination of the factors found relevant to an assessment of the credibility of pain allegations under Lund v. Bowen, *supra*, establishes that the ALJ's finding in this regard is supported by the record; the Court thus gives deference to this finding. Campbell, at 1522.

There is no question that Schulte sustained soft tissue injuries in his two motor vehicle accidents in 1994; as required, these conditions are documented by "medically acceptable clinical or laboratory diagnostic techniques." However, the record supports the ALJ's finding that Schulte's physical condition would not reasonably be expected to produce the degree of pain alleged, and the Court finds that the ALJ affirmatively linked his credibility determination to substantial evidence. Huston, *supra*. Schulte did engage in persistent attempts to find relief for his pain and had regular contact with doctors and, in addition, there is a strong possibility that psychological disorders combined with his physical problems. *See*, Luna, *supra*. However,

18

Schulte did not always take the antidepressant medication prescribed for him, and he cited his driving phobia as the reason for discontinuing psychological therapy, although he continued to see other doctors on a regular basis.

In addition, Schulte continued a fairly vigorous range of daily activities throughout the period covered by the record. He reported cooking meals two or three times a day, doing the dishes, shopping once or twice a week, vacuuming the floors, and doing light maintenance on the house and yard. (Tr. 77, 87-89, 262). He stated at the administrative hearing that he planted "a bunch of trees" in 1995. (Tr. 262). His recreational activities include fishing, reading, and walking; he goes fishing six or seven times a year. (Tr. 77, 90, 261). He goes to the gym three times a week and works out from 45 minutes to an hour or more at a time. (Tr. 263-64). He sometimes needs help lifting and moving objects; otherwise, he can take care of his own needs. (Tr. 85, 265).

He visits with friends approximately once a week, although he tends to avoid people and social events now more than before the accident, has lost some self-confidence, and has difficulty controlling his temper. (Tr. 85-86, 91, 260, 274-75). He avoids driving, as it makes him fearful (Tr. 84, 91), but he is capable of driving and took a car trip to South Dakota in October 1995. (Tr. 258-59, 268). Schulte stated at the administrative hearing that he intended to begin taking college courses in January 1996. (Tr. 252-53). He attends church approximately three times a month. (Tr. 259). There is ample support for the ALJ's finding that Schulte experienced no limitation in his activities of daily living, except that he has moderate difficulty in the area of social functioning. (Tr. 20).

The record indicates that Schulte meets the weight lifting capabilities for light work, and the ALJ appropriately considered that his cervical impairment can be alleviated by including a sit/stand option in future work. In addition, the ALJ made an appropriate evaluation of Schulte's mental

19

impairment, in the form of depression and moderate social withdrawal, and documented his findings in the Psychiatric Review Technique form, as required by Social Security regulations.  20 C.F.R. §§ 404.1520a, 416.920a (2000); Andrade v. Secretary of Health & Human Servs., 985 F.2d 1045 (10th Cir. 1993).  The ALJ took Schulte's mental condition into account in making his RFC assessment, by adding the limitation that Schulte should not work in jobs requiring direct contact with the public.

### 2.  Adoption of the VE's Opinion on Capacity to Perform Other Work.

Schulte next contends that the ALJ erred in adopting the VE's testimony and finding, at step five, that he is capable of performing the jobs of non-emergency dispatcher, surveillance monitor, and telephone answering service operator.  (Tr. 22-23).  Schulte argues that the VE erred in her identification of these jobs because she assumed that he had certain skills which he had not in fact developed in any past work, and she further erred in providing non-responsive answers to the ALJ's hypothetical.  In addition, Schulte takes issue with the ALJ's formulation of the hypothetical posed to the VE.

Schulte argues that the VE erred in her assessment that, in his past employment, Schulte acquired such skills as ordering parts and obtaining business, and therefore the jobs she identified were not ones that Schulte could perform.  Because the three jobs accepted by the ALJ do not require these particular skills, error on the part of the VE in this regard, if there was any, is irrelevant.   In addition, transferability of skills is not as important a consideration when the claimant is as young as Schulte.  Since he is not of "advanced age," he would be expected to make a vocational adjustment to new jobs which have merely "some degree of skill similarity" with his previous relevant work.  SSR 82-41, 1982 WL 31389, at *5.  The standard for claimants of advanced age, that the "job duties of their past work must be so closely related to other jobs which

20

they can perform that they could be expected to perform these other identified jobs at a high degree of proficiency with a minimal amount of job orientation," Id., is not applicable to Schulte.

The Court also rejects Schulte's contention that the VE's answers to the ALJ's hypothetical were not responsive to the question posed. The ALJ asked her to assume a person with the RFC for light work, in a low stress environment, with minimal, or no direct, contact with the public. (Tr. 285). The VE defined "no direct public contact" as including jobs that involved radio or telephone contact, and the ALJ agreed with that definition. (Tr. 285). The jobs of dispatcher and telephone answering service operator fit within these guidelines. There is ample support in the record for the ALJ's assumption, in the hypothetical posed to the VE, that Schulte's mental impairment would not render him incapable of talking on the phone or performing radio dispatching duties. The ALJ did not ask the VE to assume that Schulte was incapable of communication or could perform a job only if it involved no contact at all with the public. Indeed, the record would not support such a hypothetical. The ALJ's restriction of jobs to those involving no direct public contact was a reasonable accommodation of Schulte's moderate impairment in social functioning, and the VE committed no error in identifying these two positions. Later in the questioning, the ALJ asked the VE whether any of the positions she had identified would provide for a sit/stand option, and she responded that they all would. (Tr. 287).

Schulte also argues that the job of surveillance system monitor is not a low stress job, and the VE's identification of this job was therefore non-responsive to the hypothetical. The Court does not find it necessary to decide this issue, since other jobs were appropriately identified by the VE; however, the Court is inclined to agree with the government that Schulte provides no support for his characterization of the surveillance monitor job, other than argument of counsel.

21

Finally, Schulte argues that the ALJ's hypothetical to the VE was faulty in that it failed to include all of the impairments borne out by the evidentiary record. Evans v. Chater, 55 F.3d 530, 532 (10th Cir. 1995). Schulte cites, in particular, the ALJ's failure to mention his headaches and wrist injuries. This was not error. Although Schulte continued to complain of wrist pain throughout the period on record, he did not experience functional limitation in his wrists for any one-year period; the record indicates that his wrists returned to normal or at least "functional" range of motion fairly soon after the first accident (Tr. 125, 171, 205, 208, 237), and there is no indication that the second accident exacerbated the wrist injury (Tr. 172-73). The ALJ took into account any non-exertional pain from the wrist injury and the headaches in making his credibility determination and setting the RFC. The Court finds that the ALJ's hypothetical was appropriate and supported by record evidence.

B. Allegation of Incompetent Representation.

Finally, Schulte asserts that reversal is required because the non-attorney representative who appeared on his behalf at the administrative hearing performed inadequately. He alleges that the representative's failure to question Schulte about his physical and psychological problems following the injury, and to cross examine the vocational expert, prejudiced his claim, and that the ALJ did not fulfill his duty to develop the record, given claimant's representation by a non-attorney. This claim does not provide grounds for reversal.

The right to representation in a disability benefits hearing is "significantly different than the same right in a court proceeding." Teal v. Mathews, 425 F. Supp. 474, 480 (D. Md. 1976). Even if a lay advocate's performance "left much to be desired," this fact, standing alone, would not be dispositive. Sears v. Bowen, 840 F.2d 394, 400 (7th Cir. 1988). And even a complete

lack of counsel does not necessitate remand, unless there is a showing of unfairness or prejudice.

Evangelista v. Secretary of Health & Human Servs., 826 F.2d 136, 142 (1st Cir. 1987).

> Let there be no misunderstanding.  We do not assert that Evangelista fared as well, or presented his case as ably, as if a skilled lawyer had been retained.  Were that the criterion, then every pro se proceeding in which the applicant was less than fully successful would be in jeopardy.  It is rare indeed that veteran counsel, given the benefit of hindsight, cannot train an eagle eye to discern something that could have been done better, or more convincingly, or not at all.  The point is not whether Evangelista handled the matter as well as his current counsel might have done; rather, the point is that he was able to present his case adequately, and that the ALJ was sufficiently forthcoming to meet the attendant burden.

Id., at 143.  These comments about *pro se* representation apply as well to representation by a lay

advocate.  The test is not whether Schulte received top-flight representation; the test is whether

the proceedings were fairly conducted and the ALJ met his burden of adequately developing the

record.  The Court finds no reversible error in the proceedings.

> The ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised . . . This is true despite the presence of counsel, although the duty is heightened when the claimant is unrepresented . . . The duty is one of inquiry, ensuring that the ALJ is informed about facts relevant to his decision and learns the claimant's own version of those facts.  [Internal punctuation omitted].

Henrie v. U.S. Dept. of Health & Human Servs., 13 F.3d 359, 360-61 (10th Cir. 1993).

Schulte's physical and psychological problems are well documented in the record, and he

was given ample opportunity at the hearing to describe his impairments.  The ALJ gave him the

opportunity at the hearing to describe the injuries he sustained in the accident (Tr. 254), asked

him, "What's wrong with you that would keep you from working?  Can you tell me in your own

23

words?" (Tr. 256), and followed up the answers with open-ended questions such as "anything else?" He asked about Schulte's mental or emotional problems, his driving phobia, restrictions on social functioning, and the extent of his daily activities. (Tr. 257-65). Although Schulte faults the representative for failing to cross-examine the VE, the Court finds that the ALJ's acceptance of the VE's testimony was adequately supported by record evidence, and there is no reversible error in the handling of this testimony at the hearing.

### Conclusion

The Court finds that the ALJ's credibility assessment was supported by substantial evidence on the record, that his RFC determination was appropriately made and applied at step five of the analysis, and that he committed no error in his handling of the VE's testimony. Furthermore, the Court finds that the representation provided Schulte at the administrative hearing did not result in any prejudice or unfairness requiring reversal. The determination that Schulte was not disabled for any one-year period between the relevant dates is supported by the record.

### Recommended Disposition

That Schulte's Motion to Reverse or Remand the Administrative Decision [Doc. 8] be denied and the case be dismissed with prejudice.

Lorenzo F. Garcia
United States Magistrate Judge

24

**14**

SOCIAL SECURITY ADMINISTRATION
Office of Hearings and Appeals

DECISION

IN THE CASE OF                                    CLAIM FOR

                                                 Period of Disability,
                                                 Disability Insurance Benefits, and
STEVEN J SCHULTE                                 Supplemental Security Income
(Claimant)


                                                 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
(Wage Earner)                                    (Social Security Number)


STEVEN J. SCHULTE applied for a period of disability, disability
insurance benefits, and supplemental security income on November
29, 1994 with a protected filing date of October 27, 1994,
alleging disability since April 30, 1994.  After the Social
Security Administration (Administration) denied this claim
initially and on reconsideration, the claimant filed a hearing
request.  In response thereto and after due notice, I held a
hearing in this matter on January 11, 1996 in Albuquerque, New
Mexico, at which the claimant, accompanied by the representative,
appeared and testified.  Upon careful consideration of all the
exhibits, the testimony adduced at the hearing, and the
claimant's arguments, I FIND:

1.   The claimant met the disability-insured-status requirements
     of the Act on the above-identified alleged onset date and
     continued to meet them through December 31, 1994 (Exhibit
     14).

2.   The claimant has not engaged in post-onset substantial
     gainful activity.  He was last employed in April 1994 as a
     construction laborer (Exhibit 15).

3.   The claimant has had a "severe" impairment or combination of
     impairments: depressive disorder, headaches and injuries to
     his wrists, neck and back (Exhibits 25 and 31).

     The claimant was initially involved in a motorcycle accident
     on April 30, 1994.  He alleges both physical and mental
     impairments resulting from this accident and a subsequent
     accident (Exhibit 16).

2

The claimant was treated at the Veteran's Hospital in Albuquerque for his injuries on April 30, 1994.  He was riding a motorcycle without a helmet when a truck pulled out in front of him.  The claimant alleges he was moving at about fifty-five miles per hour when the accident occurred. He thought he lost consciousness for a short period. When he regained consciousness, he experienced neck pain, headaches and left wrist pain.  He also had multiple abrasions on his face.  He was released after receiving treatment and having several x rays and a CAT scan taken.  X rays of the claimant's mandible, left hand, left wrist and left forearm showed no fractures, but some swelling.  The x rays taken April 30 showed the claimant's cervical spine had a slight offset of the right lateral mass of C1 and possible disruption of the posterior arch of C1 which may have been related to the claimant's position at the time of the x ray or a congenital problem.  More x rays and CAT scans were done the next day.  The x rays of the cervical spine were normal, but the CAT scan revealed an irregularity in the right occipital condyle and left lateral mass of the C1 region which may have been due to the slice thickness used. On May 2, 1994, the claimant was asked to return for another CAT scan, but there are no records of a repeat CAT scan being done (Exhibit 20).

In May 1994, the claimant started treatment under Don Hedges, D.O.  In early May, Dr. Hedges assessed the claimant's condition as acute cervical and cervicodorsal musculoligamentous strain, acute bilateral wrist strain with an old fracture of the styloid process on the right, acute lumbosacral sprain/sprain syndrome, acute bilateral elbow strain with contusion to the dorsum of the right forearm and abrasions to the forehead and face (Exhibit 31). The main symptoms reported by the claimant in May and June were headaches and pain in his neck, left wrist and back. The back and neck pain reportedly included spasms.  The claimant's sensation and range of motion were normal.  He received massage therapy, ice packs, traction and medications as components of his treatment.  The doctor reported steady improvement in the claimant's condition through May and June (Exhibit 21).

In late June 1994, the claimant was evaluated by George R. Swajian, D.O.  His areas of practice are orthopedic and hand

STEVEN J SCHULTE
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

**16**

3

surgery.  Dr. Swajian's treatment notes record the
claimant as stating that his neck and back pain had
improved and that the paraesthesia he experienced in
his hands after the accident was gone.  His problems
with his upper extremities had also improved.  However,
he still reported pain in his back, neck, hands and
wrists.  The claimant's left wrist by this time had
motion well within normal range.  However, the
decreased grip strength of the claimant's hands lead
Dr. Swajian to suspect the claimant had sustained
sprains of the wrists.  He found no evidence of bulging
or herniated discs or of lumbar radiculopathy or of
peripheral neuropathy.  Dr. Swajian recommended
strengthening programs for the claimant's hands, back,
neck and thighs (Exhibit 24).

The claimant was also seen by the staff of the Hand Clinic
on June 16, 1994.  HIs hands, forearms and wrists had range
of motion within functional limits.  His strength was below
normal for a man of his age and grip tests elicited
complaints of pain.  The administrator of the test concluded
that the strength testing results were not an accurate
portrayal of the claimant's functioning.  His sensation was
within normal limits.  No atrophy, trophic changes or edema
was noted on the claimant's hands.  Phyllis Monroe,
M.O.T.R., C.H.T., concluded the claimant had only slight
tenderness and some limited active range of motion, but no
other problems (Exhibit 30).

The claimant was referred to physical therapy in August
1994.  The therapist assessed the claimant's condition as
multiple injuries to the cervical lumbar spine and left
shoulder.  The neurological examination was negative, so the
therapist believed the injuries were soft tissue in nature.
The therapist's long term goal was to return the claimant to
normal activity, eliminate pain complaints, normalize
objective data and have the claimant independently
performing a full home exercise program.  After
participating in therapy and home exercises through November
1994, the therapist said the claimant had reached maximum
medical improvement.  The claimant's strength was without
deficit.  His neurological examination was normal, and his
shoulder range of motion was normal.  However, the claimant

STEVEN J SCHULTE                                                    **17**
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

4

still reported some pain in the cervical and lumbar
areas and was given a home exercise plan for this
problem (Exhibit 23).

The claimant was evaluated by a neurologist in September
1994.  Michael Freedman, M.D., had a CAT scan done of the
claimant's head and magnetic resonance imaging done of the
claimant's neck.  Both revealed no abnormalities.  The
claimant stated his headaches, cervical discomfort and
paresthesias in his upper extremities were improving.  The
doctor concluded that the claimant's neurological
examination was normal.  There was no evidence to suggest a
cervical myelopathy.  He opined that the claimant had a post
traumatic syndrome with headaches, mild memory complaints
and some behavioral complaints.  He recommended that the
claimant pursue counselling (Exhibit 22).

In September, the claimant was again evaluated at the Hand
Clinic.  The claimant was still complaining of pain and
weakness in his hands and shoulder.  His range of motion and
strength for his hands were within normal limits, and there
was no sensory loss.  He did demonstrate some problems
during the endurance part of the testing, but the
administrator felt that the claimant was not putting forth
his best effort on these repetitive exercises (Exhibit 30).

In November 1994, the claimant had a mental assessment done
by Lynn Estrada, L.I.S.W./L.C.S.W.S.  She diagnosed the
claimant with post traumatic stress disorder and possible
depression.  Her diagnosis was based on the claimant
reporting certain symptoms that lasted over one month.
These included his reports of recurrent and obtrusive
recollections and dreams of the accident.  He also had
sudden feelings that the accident was recurring and had to
make efforts to avoid thoughts of the accident and to avoid
situations that may arouse recollections of the accident.
He could not recall important aspects of the accident.  He
reported decreased interest in significant activities, sense
of a foreshortened future, difficulty falling or staying
asleep, irritability and anger outbursts, difficulty
concentrating and hypervigilance.  All these symptoms had
lasted over one month.  She also felt the claimant could
benefit from counseling, but she only saw him for an
evaluation  (Exhibit 19).

**18**

STEVEN J SCHULTE
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

5

On December 7, 1994, the claimant was involved in another
accident.  The claimant testified that this accident
affected his neck and wrist primarily (Claimant's testimony
at hearing on January 11, 1996).  The records show the
claimant received treatment from Dr. Hedges on December 12,
1994.  Ice packs and heat were applied to the claimant's
affected areas and he had a hearing evaluation done.  The
primary complaints of the claimant seem to be regarding
ringing in his ears and pain in his neck, hip and low back.
On January 23, 1995, Dr. Hedges recommended that the
claimant's condition be reevaluated (Exhibit 31).

The claimant indicated to his therapist at Nova Care in
January 1995 that he had headaches and increased pain in the
right upper cervical spine, upper extremity symptomology and
pain throughout the entire cervical spine.  Donald Sanchez,
a physical therapist, assessed the claimant's injury as a
soft tissue injury, and his diagnosis was cervical/lumbar
strain and sprain.  He determined that the claimant's
rehabilitation potential was good (Exhibit 23).

Throughout January and in early February 1995 Dr. Hedges
noted little change in the claimant's condition (Exhibit
31).  On February 9, 1995, Dr. Swajian evaluated the
claimant's condition.  The claimant reported that prior to
his second accident he had been doing quite well.  He had
only occasional soreness during damp weather in his neck,
lower back and wrist.  Since the second accident he reported
constant pain in his neck, back and wrists and this had
continued despite treatment.  At the examination the
claimant displayed limited range of motion for the cervical
and thoracic area.  He had good abduction strength in his
fingers and wrists.  His reflexes were normal and equal
bilaterally.  There were no signs of atrophy.  Cervical
spine x rays from the date of the second accident showed
well maintained disc spaces and vertebral heights.  There
was some evidence to indicate muscle spasm.  Dr. Swajian
found no evidence of a herniated or bulging disc or cervical
radiculitis or radiculopathy or peripheral neuropathy.  He
thought the claimant appeared to have a strain/sprain of the
neck, upper back and shoulders and a slight sprain of both
wrists.  Dr. Swajian still felt that with manipulations and
physical therapy the claimant's prognosis was good (Exhibit
24).

STEVEN J SCHULTE                                                    **19**
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
                                    6

On February 19, 1995, Gerald S. Freedman, M.D. a
psychiatrist, performed a consultative examination.  He
determined that the claimant probably had a depressive
disorder and phobia related to driving.  He rated the
claimant's global assessment of functioning at a 60, which
rating indicates only a moderate impairment.  He found no
overt signs of psychosis or depression.  There were deficits
in attention, concentration, calculating ability and short
term memory.  He stated that from a psychiatric point of
view, the claimant may have problems dealing with the stress
of work and relating to co-workers (Exhibit 25).

By mid February 1995, Dr. Hedges started to note improvement
in the claimant's condition up through March 28, 1995 when
the doctor first stated that the claimant was beginning to
reach maximum medical improvement.  The claimant's condition
appears to have improved steadily through the course of his
treatment at St. Joseph's Physical Therapy.  On May 1, 1995,
Dr. Hedges released the claimant for the injuries related to
his first accident.  However, Dr. Hedges stated that the
claimant had cervical and cervical dorsal problems related
to his second accident which still required physical therapy
and medication (Exhibit 31).  The claimant was discharged
from physical therapy at St. Joseph on May 25, 1995 after 12
visits.  At this time the claimant had a normal cervical
range of motion except for an eighty percent limitation on
side bending to the right.  The claimant's headaches and
pain also had decreased since he started the program in
April.  The claimant was to return to the gym for a more
vigorous active exercise program (Exhibit 26).

By September 7, 1995, the doctor stated that the claimant
had reached maximum medical improvement  as to the cervical
and cervicodorsal problems of the second accident. By this
time the claimant's main complaints were of headaches,
discomfort in the cervical cervicodorsal area and shoulder
and right hip.  He had some anxiety and sleep discomfort
(Exhibit 31).  This completes a summary of the medical
records in the file.

4.   The claimant has not had any disorder or combination of
     disorders meeting or equalling in severity any of the
     disorders described in the Listing of Impairments, Subpart
     P, Appendix 1, Social Security Regulations No. 4.    The

**20**

STEVEN J SCHULTE
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

7

relevant listings to review concern the claimant's back
and neck injury and his depressive disorder.  There are
no pertinent listings to review regarding the wrist
injury and the headaches.

More specifically, the claimant's back and neck problems
have not met or equalled the severity required for listing
1.05(C) on other vertebrogenic disorders.  The medical
records, including those from Drs. Hedges and Swajian, do
not document that the claimant experienced appropriate
radicular distribution of significant motor loss with muscle
weakness and sensory and reflex loss (Exhibit 24 and 31).

As to the claimant's alleged mental impairment, his
depressive disorder is not of sufficient severity to meet
listing 12.04.  He does not have sufficiently serious
limitations in the four functional areas that are analyzed
in determining the severity of a mental impairment to meet
the listing.

The claimant carries on a full range of activities of
daily living.  He testified he is currently attending
The University of New Mexico.  He drives a couple of
times a week locally and he drove to South Dakota last
October.  He regularly attends church.  He also does a
lot of house work, including cooking, dishes vacuuming,
but no ironing or laundry.  In addition, he goes to the
gym three times a week for around an hour where he
works out with twenty pound weights (Claimant's
testimony at hearing on January 11, 1996).  I find no
limitation on the claimant's activities of daily
living.

The claimant does have some limitations in the social
function area.  Even though he testified he attends church
and is enrolled in college, the claimant also testified he
avoids crowds and social activities (Claimant's testimony at
hearing on January 11, 1996).  While the claimant's
situation is far from total isolation, I find that he does
have moderate difficulties in social functioning.

The third area to evaluate is concentration, persistence and
pace resulting in failure to complete tasks in a timely
manner.  The claimant was evaluated by Dr. Freedman.  He

STEVEN J SCHULTE
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

8

noted specifically that the claimant's attention,
concentration and calculation faculties were intact.
He also noted that the claimant progressed his thoughts
in a logical and coherent manner (Exhibit 25).
However, the claimant reported to the doctor that he
had poor concentration.  Giving the claimant the
benefit of the doubt, I find a slight problem exists in
this area.

The final area to evaluate is whether the claimant
experiences episodes of deterioration or decompensation in
work or work-like settings which cause him to withdraw from
the situation or to experience exacerbation of signs and
symptoms.  My review of the record revealed no reports of
such episodes.

5. The claimant has symptom-producing medical problems but
   exaggerates the symptoms and functional limitations produced
   thereby.  Hence, the claimant's testimony does not credibly
   establish symptoms or functional limitations to the extent
   alleged.

   Specifically, the claimant's subjective complaints of pain,
   weakness and fatigue are not consistent with the lack of
   medical findings and his level of daily activity.  The x-
   rays of the claimant's cervical and lumbar areas were
   basically normal and his neurological examinations were
   normal (Exhibits 22 and 24).  In addition, the claimant's
   daily activities are very extensive and include school,
   house work and work outs at the gym (Claimant's testimony at
   hearing on January 11, 1996).  This level of activity is
   not consistent with the claimant's subjective complaints.

   While I do not find the claimant's allegations of disabling
   weakness and pain credible, I do find that he does
   experience some pain and weakness.  I find that the
   claimant's subjective complaints do limit the claimant from
   doing heavy or greater exertional work.  In addition, he
   should have the opportunity to vary sitting and standing as
   needed in the work activity he undertakes.

   The claimant testified that he is currently receiving
   General Assistance from the State of New Mexico.  The
   criteria for receiving General Assistance is not the same or

**22**

STEVEN J SCHULTE
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

9

  similar to the criteria observed in the Social Security
  programs the claimant has applied for.  I have
  considered that the claimant receives assistance.
  However, that fact is not determinative in making a
  disability determination in a social security claim.

6.  The claimant has had a residual functional capacity for at
    least light work with a sit/stand option.  I have taken into
    consideration the medical reports regarding the claimant's
    condition and the claimant's own testimony that he is able
    to lift twenty pound in his exercise routine at the gym in
    reaching this determination. I also find that the claimant's
    nonexertional impairment adds an additional limitation to
    the claimant's residual functional capacity for work
    activity.  Because of the claimant's depression, he should
    not perform work which requires contact with the public.

7.  In light of my residual functional capacity finding, the
    claimant cannot return to any relevant past job.  The
    vocational expert testified that all the claimant's past
    relevant work required exertion at a medium or heavy level
    (Testimony of Judith Beard at hearing on January 11, 1996).
    The exertional requirements of the claimant's past relevant
    work exceed the residual functional capacity for work which
    I found for the claimant.

    Thus, the burden of proof shifts to the Commissioner to show
    that the claimant's age, education, work history, and
    functional capacity permit a successful adaptation to a
    significant number of other jobs in the national economy.

8.  The claimant is 38 years of age.  He has been in the younger
    individual category at all times relevant to this decision.

9.  The claimant completed 12th grade and is currently enrolled
    in college.   He is, nonetheless, unable to use this
    education to make a direct entry into skilled work.

10.  It is immaterial whether the claimant has any transferable
     skills.  I adopt the vocational expert's opinion, offered at
     the hearing, that the claimant would be able to make a
     satisfactory adjustment to the following occupations: non-
     emergency dispatcher, surveillance monitor and telephone
     answering service operator.  There are 5000 of the

STEVEN J SCHULTE
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

**23**

10

dispatcher jobs in the region and 240,000 in the
national economy.  There are 1000 of the surveillance
monitor jobs in the region and 75,000 in the national
economy .  There are 2000 of the operator jobs in the
region and 250,000 in the national economy (Testimony
of Judith Beard at hearing on January 11, 1996).  I
adopt the vocational expert's testimony given at the
hearing.  The claimant has been able to make a
satisfactory adjustment to a significant number of jobs
in the national economy and, as such, is not disabled.

## DECISION

IT IS MY DECISION, based on the application of November 29, 1994,
that STEVEN J. SCHULTE is NOT ENTITLED to a period of disability
or disability insurance benefits under Sections 216(i) and 223 of
the Social Security Act.

IT IS MY FURTHER DECISION, based on the application filed on
October 27, 1994, that the claimant is NOT ENTITLED to
Supplemental Security Income under Section 1614(a)(3) of the Act.

William F. Nail Jr.
Administrative Law Judge

AUG 05 1996
Date

**24**

<u>OHA PSYCHIATRIC REVIEW TECHNIQUE FORM</u>

NAME: Steven J. Schulte          SSN: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

Assessment is for:  Current Evaluation

Administrative Law Judge's Signature          Date

*William Y. Hail, Jr.*                    AUG 25 1998

I.   MEDICAL SUMMARY
     A.   Medical Disposition(s):   RFC Assessment Necessary
                                    (i.e., a severe impairment is
                                    present which does not meet or
                                    equal a listed impairment)

     B.   Based Upon Category(ies):    12.04

II.      <u>Reviewer's Notes</u> (Does not apply to OHA)

III.     <u>DOCUMENTATION OF FACTORS THAT EVIDENCE THE DISORDER</u>
         <u>(Evaluation of the existence of a sign or symptom</u>
         <u>CLUSTER or SYNDROME for the Listed Disorder.)</u>

         PRESENT    ABSENT

         [ ]        [x]    A.    12.02    Organic Mental Disorders
         [ ]        [x]    B.    12.03    Schizophrenic, Paranoid
                                          and other Psychotic
                                          Disorders
         [x]        [ ]    C.    12.04    Affective Disorders
         [ ]        [x]    D.    12.05    Mental Retardation and
                                          Autism
         [ ]        [x]    E.    12.06    Anxiety Related Disorders
         [ ]        [x]    F.    12.07    Somatoform Disorders
         [ ]        [x]    G.    12.08    Personality Disorders
         [ ]        [x]    H.    12.09    Substance Addiction
                                          Disorders

     C.   **12.04  Affective Disorders** - Disturbance of mood,
          accompanied by a full or partial manic or depressive
          syndrome, as evidenced by at least one of the following:

          **PRESENT-ABSENT-INSUFFICIENT EVIDENCE**

          1.    [ ]  [x]  [ ]  Depressive syndrome characterized by at
                              least four of the following:
                              a.   [ ]  Anhedonia or pervasive loss of
                                       interest in almost all
                                       activities, or

STEVEN J SCHULTE                                              **25**
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
                                          2

|       |     |     |     |                                                    |
|-------|-----|-----|-----|-----------------------------------------------------|
| b.    |     | [ ] |     | Appetite disturbance with change in weight, or      |
| c.    |     | [ ] |     | Sleep disturbance, or                               |
| d.    |     | [ ] |     | Psychomotor agitation or retardation, or            |
| e.    |     | [ ] |     | Decreased energy, or                                |
| f.    |     | [ ] |     | Feelings of guilt or worthlessness, or              |
| g.    |     | [ ] |     | Difficulty concentrating or thinking, or            |
| h.    |     | [ ] |     | Thoughts of suicide, or                             |
| i.    |     | [ ] |     | Hallucinations, delusions or paranoid thinking      |

2.    [ ] [x] [ ]  Manic syndrome characterized by at least
                   three of the following:
    a.   [ ]   Hyperactivity, or
    b.   [ ]   Pressures of speech, or
    c.   [ ]   Flight of ideas, or
    d.   [ ]   Inflated self-esteem, or
    e.   [ ]   Decreased need for sleep, or
    f.   [ ]   Easy distractibility, or
    g.   [ ]   Involvement in activities that
                            have a high probability of
                            painful consequences which are
                            not recognized, or
    h.   [ ]   Hallucinations, delusions or
                            paranoid thinking

3.    [ ] [x] [ ]  Bipolar syndrome with a history of
                   episodic periods manifested by the full
                   symptomatic picture of both manic and
                   depressive syndromes (and currently
                   characterized by either or both
                   syndromes)

4.    [ ] [x] [ ]  Other: Depressive Disorder.


IV.    <u>RATING OF IMPAIRMENT SEVERITY</u>

  A.   <u>"B" CRITERIA OF THE LISTINGS</u>

THE FOLLOWING FUNCTIONAL LIMITATIONS (WHICH APPLY TO PARAGRAPH B OF LISTINGS
12.02-12.04 AND 12.06-12.08 AND PARAGRAPH D OF 12.05) EXIST AS A RESULT OF
THE INDIVIDUAL'S MENTAL DISORDER(S).

STEVEN J SCHULTE                                                **26**
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
                                   3

NOTE:      ITEMS 3 AND 4 BELOW ARE MORE THAN MEASURES OF FREQUENCY.  DURATION
           AND EFFECTS OF THE DEFICIENCIES (ITEM 3) OR EPISODES (ITEM 4) ARE
           DISCUSSED IN THE DECISION.

Listing(s) under which the items below are being rated:  **12.04**

### FUNCTIONAL LIMITATION AND DEGREE OF LIMITATION

---

   1.   Restrictions of Activities of Daily Living:

None[x]  Slight[ ]  Moderate[ ]  Marked*[ ]  Extreme[ ]  Insuff Evid[ ]

---

   2.   Difficulties in Maintaining Social Functioning:

None[ ]  Slight[ ]  Moderate[x]  Marked*[ ]  Extreme[ ]  Insuff Evid[ ]

---

   3.   Deficiencies of Concentration, Persistence or Pace Resulting in Failure
        to Complete Tasks in a Timely Manner (in work settings or elsewhere):

Never[ ]  Seldom[x]  Often[ ]  Frequent*[ ]  Constant[ ]  Insuff Evid[ ]

---

   4.   Episodes of Deterioration or Decompensation in Work or Work-Like
        Settings Which Cause the Individual to Withdraw from that Situation or
        to Experience Exacerbation of Signs and Symptoms (which may Include
        Deterioration of Adaptive Behaviors):

Never[x]  Once/Twice[ ]  Repeated*(3+)[ ]  Continual[ ]  Insuff Evid[ ]

---

*Degree of limitation that satisfies the Listings: Extreme, Constant and
Continual also satisfy that requirement.

   B.   Summary of Functional Limitation Rating for "B" Criteria

NO. OF FUNCTIONAL LIMITATIONS MANIFESTED AT THE LISTING LEVEL: [0]
(The number must be at least 2 to satisfy the requirements of paragraph B in
Listings 12.02, 12.03, 12.04 and 12.06 and paragraph D in 12.05; and at least
3 to satisfy the requirements in paragraph B in Listings 12.07 and 12.08.)